UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

| | |
|---|---|
| In re: ) | |
| ) | Case No. 18-00178-GS |
| WILSON MANIEGO NABONG, ) | |
| ) | |
| Debtor. ) | Chapter 7 |
| _____) | |
| ) | |
| LIEW ZAVACKY f/k/a ) | |
| SAELEE, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Adversary Proceeding No. 18-90031-GS |
| WILSON NABONG, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**POST-TRIAL MEMORANDUM DECISION**

Debtor Wilson Nabong (Mr. Nabong) and his then-girlfriend Liew Zavacky (Ms. Zavacky) opened an e-cigarette business together in Anchorage, Alaska. Ms. Zavacky invested her savings and incurred additional debt to open and initially operate the business. Approximately one year later, the couple ended their personal relationship. After they parted, Mr. Nabong promised to repay Ms. Zavacky the funds she invested in the business. He failed to do so. Ms. Zavacky sued Mr. Nabong in state court for the amount owed. The state court conducted a trial and entered oral findings of fact and conclusions of law in favor of Ms. Zavacky. Mr. Nabong filed his bankruptcy case before the state court entered judgment. Ms. Zavacky now seeks an order determining that the debt Mr. Nabong owes her is excepted from his discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(15). For the reasons stated below, the court finds that Ms. Zavacky has not established a basis to except the debt from Mr. Nabong's discharge.

# FACTS

Mr. Nabong and Ms. Zavacky met in 2005, and decided to live together during that same year.[1] The following year, the couple had a child.[2] In 2007, Mr. Nabong transferred title to a four-plex rental property (Four-plex) that he had owned with a prior girlfriend to himself and Ms. Zavacky.[3] Ms. Zavacky and Mr. Nabong were never married.[4]

In 2014, while employed elsewhere Mr. Nabong and Ms. Zavacky opened an e-cigarette business together, Bloo Monkey Vapes.[5] A business license was issued to Ms. Zavacky and Mr. Nabong as partners of Bloo Monkey Vapes on April 8, 2014, with an expiration date of December 31, 2015.[6] The license identified the business as a partnership.[7] To open and operate the business, Ms. Zavacky committed over $23,000.00 in personal savings and a $5,000.00 loan from her parents to the business. She also opened a line of credit and multiple credit cards to finance the business.[8] Ms. Zavacky left her job to run the new business, while Mr. Nabong helped as he could while working a graveyard shift as a plant operator at Providence Hospital.[9] The business reported a loss of approximately $94,000.00 on its 2014 tax return.[10]

In the spring of 2015, Ms. Zavacky and Mr. Nabong ended their personal relationship.[11] In connection with their parting, they discussed what to do with the Four-plex and the business.[12] Mr. Nabong claims that he wanted to leave the state of Alaska. He testified that he offered both the Four-plex and the business to Ms. Zavacky, who declined.[13] Ms. Zavacky asserts that instead, she agreed to give Mr. Nabong her interest in the Four-plex and the business in

---

[1] ECF No. 34-1, p. 4; Adv. Tr. 9:19-20.
[2] *Id.* at p. 4; Adv. Tr. 9:21-22.
[3] *Id.* at p. 4, 12; Adv. Tr. 9:25-10:1, 39:4-17.
[4] *Id.* at p. 7; Adv. Tr. 22:10-12.
[5] *Id.* at p. 12; Adv. Tr. 40:15-20.
[6] ECF No. 27-2, p. 16; St. Tr. 55:16-23.
[7] ECF No. 27-3, p. 20.
[8] ECF No. 34-1, p. 4; Adv. Tr. 10:9-22.
[9] *Id.* at p. 8; Adv. Tr. 23:24-24:5.
[10] ECF No. 27-2, p. 31; St. Tr. 113:21-114:8.
[11] *Id.* at p. 4; St. Tr. 6:23-7:11.
[12] ECF No. 34-1, p. 5; Adv. Tr. 13:24-14:8.
[13] *Id.* at p. 13; Adv. Tr. 45:4-46:4.

exchange for his promise to repay her the amounts she had invested in the business.[14] Mr. Nabong was to make periodic payments to her of $300.00-$1,000.00.[15]

The parties agree that they never drafted or signed any written agreement detailing the terms by which Ms. Zavacky would transfer her ownership in the business and the Four-plex to Mr. Nabong. Similarly, there is no written agreement concerning Mr. Nabong's obligation to repay Ms. Zavacky for the monies she contributed to the business partnership. Strikingly, the parties never agreed upon the exact amount of Mr. Nabong's debt owed to Ms. Zavacky or the timing for repayment. Nor was there any mention of interest. Similarly, there is no evidence as to when Ms. Zavacky was supposed to transfer her interests in the business and the Four-plex to Mr. Nabong. Rather, the only writing referencing an agreement between the parties is a text message Mr. Nabong sent to Ms. Zavacky during this period in 2015 stating: "Just quit being angry and I promise I'll get everything back to you!!"[16]

After sending the text, Mr. Nabong began making payments to Ms. Zavacky in June 2015. The payments varied in amount. Mr. Nabong made at least one payment monthly between June 2015 and February 2016. His last payment was made in December 2016. Some of the payments included notations, summarized in Ms. Zavacky's closing argument brief as follows:[17]

| DATE | AMOUNT | COMMENT | ECF NO. 27-4 |
|---|---|---|---|
| 6/22/15 | $300 | Fathers Day | p. 157 |
| 7/7/15 | $1,000 | Baby Mama | p. 158 |
| 7/27/15 | $1,000 | Baby Mama | p. 163 |

---

[14] ECF No. 27-2, p. 14; St. Tr. 46:13-20; ECF No. 34-1, p. 9; Adv. Tr. 30:11-16. This statement with regard to the Four-plex is inconsistent with Ms. Zavacky's state court testimony. First, she stated that she and Mr. Nabong agreed, at the time they ended their relationship, that "we didn't have a written agreement on anything, but when we split up the four-plex was going to be kept under our name." ECF No. 27-2, p. 5; St. Tr. 10:25-11:3. Second, she also stated that she transferred the Four-plex to Mr. Nabong in an effort to improve and preserve her credit score after she discovered the Four-plex was in foreclosure, *not* as part of her agreement with Mr. Nabong. *See id.* at pp. 5-6, 28; St. Tr. pp. 11:3-9, 12:23-13:4, 100:5-25.
[15] ECF No. 34-1, p. 9; Adv. Tr. 29:21-30:6.
[16] *See* ECF No. 27-4, p. 219.
[17] ECF No. 32, p. 2.

3

| DATE | AMOUNT | COMMENT | ECF NO. 27-4 |
|---|---|---|---|
| 8/27/15 | $800 | Winter Clothes | p. 169 |
| 9/14/15 | $500 | N/A | p. 171 |
| 9/14/15 | $300 | N/A | p. 171 |
| 9/25/15 | $300 | Laylas Birthday | p. 176 |
| 10/26/15 | $500 | Hush Up | p. 183 |
| 11/6/15 | $560 | Will Pay Back | p. 184 |
| 11/25/15 | $350 | Laylas Momma | p. 189 |
| 1/5/16 | $350 | Lordy Lordy | p. 196 |
| 1/22/16 | $350 | Laylas | p. 197 |
| 2/18/16 | $350 | Trying | p. 204 |
| 9/22/16 | $350 | Child Support/Laylas Birthday | p. 208 |
| 12/19/16 | $2,000 | Child Support | p. 215 |

In the state court proceeding, Ms. Zavacky testified that eleven of the fourteen payments made by Mr. Nabong were either wholly or at least partially attributable to the debt.[18] The parties agree that the last two payments were for child support.[19]

After Ms. Zavacky and Mr. Nabong ended their relationship, Mr. Nabong offered his sister the opportunity to run the e-cigarette business, which she did from August 2015 until November 2015.[20] Shortly before the business license for the partnership expired on December 31, 2015, Mr. Nabong filed Articles of Organization for Bloo Monkey Vapes LLC, naming himself as registered agent for the company and listing himself as its sole official with the title of "organizer."[21] The certificate of organization for Bloo Monkey Vapes LLC was issued the same day.[22] There was no testimony regarding the transfer of assets from the partnership to the limited liability company, but the clear inference from the evidence is that after the partnership expired in December 2015 the e-cigarette business was run through the newly created Bloo Monkey Vapes LLC.

---

[18] *See* ECF No. 27-2, pp. 14-15; St. Tr. pp. 45:17-50:12. Attributions to child support are detailed at ECF No. 27-2, p. 16; St. Tr. p. 52:1-14.
[19] *See id.* at p. 15; St. Tr. pp. 49:24-50:12; ECF No. 34-1, p. 6; Adv. Tr. p. 18:21-25.
[20] ECF No. 34-1, p. 16; Adv. Tr. p. 56:6-57:15.
[21] ECF No. 27-3 at p. 22-23.
[22] *Id.* at p. 24.

4

A few months later, on March 29, 2016, Mr. Nabong's then-girlfriend (now wife) Jennifer Swanson filed a statement of change of registered agent for Bloo Monkey Vapes LLC, naming herself as the registered agent for the company.[23] Mr. Nabong testified that he sold Bloo Monkey Vapes LLC to Jennifer for $10.00 in March of 2016.[24] On October 24, 2016, Jennifer filed a notice of change of officials with the State of Alaska, naming herself (as Jennifer Pastrana Masloff) as 100% member and manager of the company.[25] Jennifer has since owned and operated the e-cigarette business.

On June 13, 2016, a Notice of Default under Deed of Trust, listing Mr. Nabong and Ms. Saelee as owners, was recorded to commence foreclosure against the Four-plex.[26] The foreclosure sale was scheduled for September 21, 2016.[27] Ms. Zavacky testified that in 2016, she was contacted by someone allegedly representing Mr. Nabong who advised her that the Four-plex was in foreclosure, and who told Ms. Zavacky to convey her interest in the Four-plex to Mr. Nabong in order to protect her credit score.[28] Following the phone conversation, Ms. Zavacky did just that; she executed a quitclaim deed transferring her interest in the Four-plex to Mr. Nabong.[29] The quitclaim deed was recorded on August 31, 2016.[30] Several months later, on January 17, 2017, a Loan Modification Agreement was recorded capitalizing $24,140.50 in past due payments and extending the term of the loan, which was in Mr. Nabong's name only.

On January 23, 2017, Mr. Nabong commenced an action against Ms. Zavacky in state court regarding the custody of their child.[31] Ms. Zavacky filed a counterclaim against Mr. Nabong, asserting that he owed her money pursuant to their June 2015 agreement.[32] The state

---

[23] *Id.* at p. 25.
[24] ECF No. 34-1, p. 16; Adv. Tr. 57:16-58:9.
[25] ECF No. 27-3, pp. 26-27.
[26] *Id.* at pp. 9-10.
[27] *Id.* at p. 9.
[28] ECF No. 27-2, p. 5; St. Tr. 11:1-9.
[29] ECF No. 27-3, pp. 4-8.
[30] *Id.* at p. 4.
[31] Adv. Tr. Ex. 11.
[32] Adv. Tr. Ex. 12.

5

court conducted a trial on her counterclaim. At the conclusion of testimony on May 16, 2018, the state court read its findings of fact and conclusions of law into the record.[33] The court ruled in favor of Ms. Zavacky, stating that "[t]here was an oral contract and there was a breach. The amount that should have been paid was $52,296.47. It wasn't. Amount's due as of July 1, 2015…This is the order of the Court. It's final…the appeal time starts when I sign the judgment…."[34]

On June 11, 2018, Mr. Nabong commenced his bankruptcy under chapter 13, prior to entry of the state court judgment against him. He listed $59,821.63 under Schedule E/F as a noncontingent, liquidated, undisputed unsecured claim, referencing the state court proceeding case number (3AN-17-04358 CI).[35] He also listed the state court proceeding as "pending" under item 9 of his Statement of Financial Affairs.[36] Yet, Mr. Nabong did not identify this debt as owed to Ms. Zavacky. Instead, he listed the creditor's name as Anchorage District Court, Alaska. Ms. Zavacky was not listed on his mailing matrix.[37]

On July 16, 2018, Mr. Nabong filed an amended Schedule J reflecting a negative monthly net income of over $800.[38] On July 20, 2018, Mr. Nabong moved to convert his case to chapter 7.[39] The court granted the motion and converted his case to chapter 7 on July 23, 2018.[40] Pursuant to the court's Notice of Chapter 7 Bankruptcy Case, the deadline for objections to Mr. Nabong's discharge was set for October 22, 2018.[41] On the last day for challenging the nondischargeability of debts, Ms. Zavacky filed her Complaint for Determination of Dischargeability Pursuant to Sections [sic] 523 of the Bankruptcy Code (Complaint). Pursuant

---

[33] *See* ECF No. 27-2, pp. 44-47; St. Tr. 164:16-175:5.
[34] *Id.* at p. 46; St. Tr. 174:18-175:5.
[35] ECF No. 1, p. 23.
[36] *Id.* at p. 44.
[37] *Id.* at pp. 56-57.
[38] ECF No. 19.
[39] ECF No. 21.
[40] ECF No. 22.
[41] ECF No. 25.

6

to the Complaint, Ms. Zavacky seeks a determination that the debt owed to her by Mr. Nabong is excepted from his discharge under §§ 523(a)(2)(A) and 523(a)(15). Mr. Nabong's discharge was entered on October 23, 2018, subject to the determination of the dischargeability of his debt owed to Ms. Zavacky.[42]

The court held a trial in this proceeding on June 7, 2019. Ms. Zavacky's closing argument was presented in writing on July 8, 2019.[43] Mr. Nabong's closing argument was presented in writing on July 26, 2019.[44]

## LEGAL ANALYSIS

**A.    Denial of Dischargeability Under § 523(a) Generally**

"Debts are presumed to be dischargeable in bankruptcy, and the limited exceptions to discharge contained in the Bankruptcy Code must be construed strictly in favor of the debtor."[45] Accordingly, "[a]ll exceptions to discharge are to be construed narrowly so that they are confined to their plainly-expressed terms."[46] The Bankruptcy Appellate Panel (BAP) has explained the reasons underlying this rule of construction as follows:

> All exceptions to discharge are to be construed narrowly so that they are confined to their plainly expressed terms…[E]ach exception to discharge represents Congress' attempt to balance the debtor's entitlement to a fresh start against strong competing policy concerns. To the extent Congress has not adequately balanced the competing policies, Congress will need to amend the discharge exceptions. It is not up to the courts to expand the coverage of the exceptions under the guise of an improper and unwarranted liberal construction of the exceptions.[47]

---

[42] ECF No. 49.
[43] Adv. ECF No. 32.
[44] Adv. ECF No. 36.
[45] *Norrell Health Care, Inc. v. Clayton (In re Clayton)*, 168 B.R. 700, 709 (Bankr. N.D. Cal. 1994) (*citing Gregg v. Rahm (In re Rahm)*, 641 F.2d 755, 756–57 (9th Cir. 1981), *cert. denied*, 454 U.S. 860, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981); 3 Collier on Bankruptcy ¶ 523.05A at 523–19 (15th ed.1994)).
[46] *Bendetti v. Gunness (In re Gunness)*, 505 B.R. 1, 7 (B.A.P. 9th Cir. 2014).
[47] *Id.* at 8.

B.     **Claims Under § 523(a)(2)(A)**

Section 523(a)(2)(A) excepts from discharge any debt for "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  A creditor objecting to a debtor's discharge under § 523(a)(2)(A) must prove the following by a preponderance of the evidence: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct."[48]

Here, the parties agree that Mr. Nabong owes Ms. Zavacky the principal amount of $52,296.47 per the state court's findings, which Mr. Nabong has calculated at $59,821.63 as of the date of his bankruptcy per his schedules.[49]  Ms. Zavacky does not specifically identify whether she is challenging the dischargeability of Mr. Nabong's debt based upon false pretenses, false representation, or actual fraud.  Her trial brief, however, states that "[i]f a party has no intent to repay when entering into a debt, that is a misrepresentation."[50]  Accordingly, the court construes that she is asserting that Mr. Nabong's promise to repay her the amounts she invested in the e-cigarette business was a false representation.

"[F]or a representation to be actionable under § 523(a)(2)(A), it must be one of existing fact and not simply...a declaration of intention."[51]  This is because "[w]ere a creditor able to successfully argue that a debt is nondischargeable simply because a debtor failed to follow through on a future promise to pay, most bankruptcy debts would never discharge. As a result,

---

[48] *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000).
[49] While the state court never entered final judgment due to the filing of the bankruptcy, the parties have treated the oral findings as conclusive, and Mr. Nabong does not challenge them in the adversary.  The court, therefore, treats the underlying debt as undisputed.
[50] *See* ECF No. 15 at p. 4.
[51] *Narang v. Biswas (In re Biswas)*, 2009 WL 7809011, at *5 (B.A.P. 9th Cir. Sept. 2, 2009) (citing *Smith v. Myers (In re Schwartz & Myers)*, 130 B.R. 416, 423 (Bankr.S.D.N.Y.1991)).

8

only current or past acts can form the basis of a fraud claim under § 523(a)(2)(A)."[52] Still, where a debtor lacked the subjective intent to perform the act at the time he or she made the promise, the representation can suffice as an actionable fraudulent representation.[53]

Ms. Zavacky contends that Mr. Nabong never intended to repay the funds she invested in the e-cigarette business at the time he sent his text message to her in June 2015. Importantly, Ms. Zavacky must prove that Mr. Nabong lacked the subjective intent to perform at the time he made the promise. In her closing brief, she argued, "[Mr. Nabong] had no intention of paying the debt. He only needed to string Ms. Zavacky along until he was able to complete the $10 transfer to Jennifer, at which time, in his mind, he was home free."[54] In short, Ms. Zavacky argues that proof of Mr. Nabong's true intent not to repay her investment is apparent from his failure to make the payments. She acknowledges that he initially made a handful of payments, but contends that he only made the minimum payments he needed to transfer the business and the Four-plex. This argument does not withstand scrutiny.

Mr. Nabong did not receive Ms. Zavacky's interest in the Four-plex at the time he promised to repay her investments in June 2015. Rather, she quitclaimed the property to him over a year later, on August 31, 2016, and only after there was an impending foreclosure scheduled. Together, the Notice of Default and quitclaim deed corroborate the testimony that the parties were delinquent on the Four-plex, and further support the inference that they were unable to pay the monthly mortgage payment.

Ms. Zavacky quitclaimed the property in August 2016, but Mr. Nabong had stopped making the monthly payments to her in February 2016. Still, Ms. Zavacky views this as clear

---

[52] *Yates v. Davis (In re Davis)*, 2013 WL 5796657, at *2 (Bankr. M.D. Ala. Dec. 23, 2013). *See also Farina v. Balzano (In re Balzano)*, 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991) ("A bare promise to be fulfilled in the future, which is not carried out, does not render a consequent debt nondischargeable under § 523(a)(2)(A).").

[53] *Bernacchi v. Cascio (In re Cascio)*, 568 B.R. 851, 856 (Bankr. M.D. Fla. 2017) ("If a representation relates to the debtor's intent to perform an act in the future, the representation will not be actionable under § 523(a)(2)(A) unless the debtor lacked the subjective intent to perform the act at the time that the statement was made.") [internal citations omitted].

[54] ECF No. 32, p. 4.

9

evidence that he never intended to repay her the monies she invested in Bloo Monkey Vapes. She argues that Mr. Nabong's final payment to her "dovetails nicely with his transfer of the business to Jennifer" on March 29, 2016.[55] The facts, however, belie these arguments.

It is clear that Ms. Zavacky left the business, either explicitly or implicitly, in 2015.[56] Ms. Zavacky simply ceased her involvement in the business.[57] This left Mr. Nabong to deal with the business while still working for Providence. However, there is no evidence that Ms. Zavacky ever "transferred" her interest in the business to Mr. Nabong. Instead, when the partnership's business license was set to expire at the end of 2015, Mr. Nabong created a limited liability company in December 2015. The limited liability company was owned by Mr. Nabong, and proceeded to operate the business thereafter. Mr. Nabong did not need to string Ms. Zavacky along before "transferring the business." There is no evidence that she was interested in continuing the business partnership, or any involvement in the business. Rather, it appears that she simply abandoned it. Mr. Nabong took sole control of the business when she left, and took ownership of the business in December 2015 when he created the limited liability company. As a result, Ms. Zavacky never actually conveyed any interest in the business partnership to Mr. Nabong. She certainly did not do so in June 2015 when Mr. Nabong made his promise. Equally as important, Mr. Nabong had taken exclusive ownership of the business by December 2015, before he stopped making his payments to Ms. Zavacky. He already had control over the business when he stopped making his payments after February 2015.

Mr. Nabong offers a much different explanation of why he stopped making payments to Ms. Zavacky. He maintains that he was struggling financially with the e-cigarette business and the Four-plex. This is why he asked his sister to run the business from August 2015 until

---

[55] *Id*.
[56] ECF No. 34-1, pp.10-11; Adv. Tr. pp. 34:25-35:8.
[57] ECF No. 36, pp. 2-3.

November 2015.[58] It was during that time, that Mr. Nabong made multiple payments to Ms. Zavacky. In fact, *all* of the payments Mr. Nabong made to Ms. Zavacky were made *after* she was no longer involved in the e-cigarette business.[59] But his sister stopped running the business at the end of 2015. Around this time, Mr. Nabong was unable to make the payments on the Four-plex as well, resulting in the Notice of Default being recorded in June 2016. In between these events, Mr. Nabong transferred the business to his limited liability company, and several months later transferred the business to his girlfriend.

The court appreciates why Ms. Zavacky believes Mr. Nabong never intended to pay her the full amount of her business investment; he failed to do so. But the court accepts and finds that Mr. Nabong was in financial difficulties that prevented him from being able to continue his monthly payments to Ms. Zavacky, or to make his monthly mortgage payment on the Four-plex.[60] The court further finds credible Mr. Nabong's testimony that the business was not profitable during this period of time, and that he was actively attempting to get rid of the business. The fact that he ultimately transferred the business to his then-girlfriend raises natural concerns attendant to transfers between insiders. But the transfer occurred months after Mr. Nabong had made his promise to Ms. Zavacky, who had by then left the business Mr. Nabong was struggling to salvage.

Within this context, Mr. Nabong's transfer of the business to his girlfriend is not probative of his subjective intent to perform when he made the promise to pay months earlier in June 2015. Rather, the pattern of payments for several months immediately after making the

---

[58] ECF No. 34-1, p. 16; Adv. Tr. p. 56:6-57:15. Mr. Nabong further testified that Ms. Zavacky consented to handing operation of the business over to Mr. Nabong's sister. *See* ECF No. 34-1, pp. 13-14; Adv. Tr. p. 46:23-47:9. Because Ms. Zavacky did not controvert this statement either in her testimony at trial or in her closing argument, the court presumes that Mr. Nabong is correct and Ms. Zavacky did consent to Mr. Nabong's sister running the business.
[59] *See* ECF No. 27-2, pp. 14-15; St. Tr. p. 47:10-49:9; *see also* ECF No. 27-4, pp. 156-218.
[60] The court is aware that Mr. Nabong was able to enter into a loan modification for the Four-plex in December 2016 to save the property from foreclosure. However, the subsequent events at the end of 2016 do not negate Mr. Nabong's financial difficulties, or the court's factual findings as to his intent to make repayments measured in June 2015.

11

promise is much more telling. "Where a debtor makes payments to the lender, courts will consider this evidence as indicative of a debtor's lack of fraudulent intent."[61] While Ms. Zavacky argues that she considers some of those payments were for child support, regardless of the exact allocation, the point remains that Mr. Nabong made an effort to make monthly payments after making the agreement to repay Ms. Zavacky's business investment.

Given the amount of time that had passed between the promise and the events Ms. Zavacky now raises, Mr. Nabong's efforts to make payments, and his general financial problems during this time, the court concludes that Mr. Nabong had the subjective intent to pay Ms. Zavacky the monies she contributed to the business at the time he made that promise. As such, Ms. Zavacky cannot establish that Mr. Nabong made a false representation under § 523(a)(2)(A) concerning his repayment to Ms. Zavacky. Similarly, Ms. Zavacky cannot establish that Mr. Nabong knowingly made a false statement with the intent to deceive. For these reasons, she has failed to prove her claim under § 523(a)(2)(A).

### C.    Claims Under 11 U.S.C. § 523(a)(15)

Ms. Zavacky also claims that the promise to repay her partnership contribution is nondischargeable under § 523(a)(15), which excepts from discharge any debt owed "to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, or a determination made in accordance with State or territorial law by a governmental unit."[62] Generally speaking, "[Section] 523(a)(15) covers other, non-support obligations arising from domestic relations proceedings."[63] Under § 523(a)(15), the plaintiff bears the initial burden of proof, and must

---

[61] *Balzano,* 127 B.R. at 531; *see also Dillon v. Riley (In re Riley)*, 2005 WL 1346984, at *6 (Bankr. N.D.Ill. May 31, 2005) (defendant's partial repayments to the plaintiffs demonstrated his "intent to perform in accordance with his representations."); *Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 36 (B.A.P. 9th Cir. 2009) (finding that payments made for several months weighed against finding of intent to defraud).
[62] 11 U.S.C. § 523(a)(15).
[63] *Gunness*, 505 B.R. at 3.

demonstrate "by a preponderance of the evidence that the subject debt 1) is not a support obligation of the kind described in § 523(a)(5), and 2) was incurred by the debtor in a divorce or separation or under a separation agreement, divorce decree or marital dissolution judgment or order."[64]

        1.      <u>Constitutional Challenges and Whether Ms. Zavacky is a Spouse or Former Spouse for Purposes of § 523(a)(15)</u>

Ms. Zavacky's claims under § 523(a)(15) are complicated by the fact that she and Mr. Nabong were never married. Section 523(a)(15) is directed to claims by a spouse or former spouse. In her Complaint, Ms. Zavacky argued that failing to categorize her as defendant's "spouse" violates her rights under the equal protection clauses of the United States and Alaska constitutions.[65] Both parties addressed the serious legal questions surrounding the determination of whether Ms. Zavacky qualified as a spouse or former spouse under § 523(a)(15) in their pre-trial briefing.[66] In this instance, however, the court need not resolve this question because Mr. Nabong's breach of his contract with Ms. Zavacky was not incurred in the course of a divorce or separation.

---

[64] *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 919 (B.A.P. 9th Cir. 2014) (citing *Ruhlen v. Montgomery (In re Montgomery)*, 310 B.R. 169, 177 (Bankr. C.D. Cal. 2004)).

[65] *See* ECF No. 1, pp. 7-8, ¶ 36; ECF No. 15, pp. 7-8. Ms. Zavacky's constitutional challenges fail on a procedural basis. Fed. R. Bankr. P. 9005.1 incorporates Fed. R. Civ. P. 5.1, which sets forth certain procedures that must be followed if a party "filed a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute." Ms. Zavacky has not complied with those requirements.

[66] In *In re Cusimano*, 2013 WL 9736597, at *3 (Bankr. C.D. Cal. Nov. 12, 2013), the United States Bankruptcy Court for the Central District of California ruled that under applicable California law, registered domestic partners had the same rights as those provided to spouses, and thus the debtor's former registered domestic partner qualified as a "spouse" for purposes of § 523(a)(15). Conversely, in Oregon, where a debtor's co-habitant girlfriend had neither married the debtor, nor attempted to register as a domestic partner of the debtor, she did not qualify as the debtor's "former spouse" for purposes of § 523(a)(15). *Sato v. Hanlon (In re Hanlon)*, 557 B.R. 801, 805-806 (Bankr. D. Or. 2016); *see also Barnes v. Bakkar (In re Bakkar)*, 2009 WL 3068192 (Bankr. D. N.J. Sept. 22, 2009) (plaintiff's palimony judgment alone was insufficient to demonstrate she was the debtor's "spouse" for purposes of § 523(a)(15), since palimony judgment is available to persons who live together in marriage-like arrangement without being formally married). Alaska recognizes property rights in domestic partnerships. *See Tomal v. Anderson*, 426 P.3d 915 (Alaska 2018). However, Ms. Zavacky has not demonstrated that, like California, Alaska gives domestic partners equal rights to spouses. *See Harris v. Millennium Hotel*, 330 P.3d 330, 335 n.29 (Alaska 2014) (citing AS 25.05.011(b), *held unconstitutional on other grounds, Hamby v. Parnell*, 56 F.Supp.1056 (D. Alaska 2014)).

13

2.     Applicability of § 523(a)(15)

"For a debt to qualify for treatment under § 523(a)(15), the critical issues are the nature of the debt, not the payee, and whether under state law the debt was incurred in the course of a divorce or separation."[67] The court considers each of these elements in turn.

a.     Nature of the Debt

To fall within § 523(a)(15), the debt must be one that is "not of the kind described in paragraph (5)."[68] Section 523(a)(5) excepts from discharge any domestic support obligation, which is defined to include alimony, maintenance or support.[69]

Ms. Zavacky argues that the court must consider Mr. Nabong's contractual debt nondischargeable under § 523(a)(15) because Ms. Zavacky needs that money to take care of their daughter. She also points to statements that Mr. Nabong has acknowledged that the contract payments would help provide for his daughter. Ms. Zavacky's argument focuses upon her intended use of the funds. But the court must determine the nature of the *debt*, and whether it is of a kind described in § 523(a)(5). Ironically, Ms. Zavacky appears to equate the payments due under her repayment agreement with Mr. Nabong to child support, which would preclude her claim under § 523(a)(15) since claims for support fall under § 523(a)(5). Ms. Zavacky has not asserted § 523(a)(5) as a basis for her nondischargeability claims. Moreover, the testimony at trial established that Mr. Nabong is under an existing child support order and is current on those obligations.[70] Ms. Zavacky does not contend otherwise.

The state court was clear that the debt subject to Ms. Zavacky's counterclaim was one arising from a business arrangement and represented a breach of contract. In the Complaint, her Trial Brief, and her Closing Argument, Ms. Zavacky very clearly describes the *debt* owed to her by Mr. Nabong as inherently a business debt. She entered into an e-cigarette business with Mr.

---

[67] *Montgomery*, 310 B.R. at 177.
[68] 11 U.S.C. § 523(a)(15).
[69] *See* 11 U.S.C. § 101(14A).
[70] *See* ECF 34-1, p. 21; Adv. Tr. p. 75:3-10.

14

Nabong, invested her savings, and incurred additional debt in the establishment and operation of that business. When their personal relationship ended, Ms. Zavacky wanted out of the business and Mr. Nabong promised to repay the monies she had contributed to the business. The nature of the *debt* that Ms. Zavacky seeks to except from discharge is, in essence, a business investment (if not contribution to a partnership). For these reasons, this debt is not in the nature of a debt encompassed under § 523(a)(5), and the first inquiry under § 523(a)(15) is satisfied.

b.  Incurred in the Course of a Divorce or Separation

To establish a claim under § 523(a)(15), Ms. Zavacky must also prove that Mr. Nabong's debt was incurred in the course of a divorce or separation. "Section 523(a)(15) excepts non-support debts arising in connection with a divorce or dissolution proceeding from discharge in bankruptcy."[71] The debt in question arose from Mr. Nabong's promise to repay Ms. Zavacky her business investment. When Mr. Nabong breached that agreement, Ms. Zavacky sued to obtain judgment to enforce his promise. As the state court observed, this was a breach of contract claim. As such, the debt does not arise from divorce or separation.

The language of § 523(a)(15) does refer to "other order of a court of record," and this language could be construed broadly. But the Ninth Circuit has favorably cited *In re Crosswhite*, 148 F.3d 879, 881-82 (7th Cir. 1998), in which the Seventh Circuit held that "[Section] 523(a)(15) 'is intended to cover divorce-related debts such as those in property settlement agreements.'"[72] While Ms. Zavacky raised her claim within a child custody case, the debt did not arise within that action. Rather, the debt arose in June 2015 when Mr. Nabong promised to repay Ms. Zavacky's business investment. Her crossclaim in the state court action

---

[71] *Adam v. Dobin (In re Adam)*, 2015 WL 1530086, at *4 (B.A.P. 9th Cir. Apr. 5, 2015), *aff'd*, 677 F. App'x 353 (9th Cir. 2017) (citing two cases addressing debts in connection with a divorce or divorce decree).

[72] *Short v. Short (In re Short)*, 232 F.3d 1018, 1023 (9th Cir. 2000); *see also Tracy v. Tracy (In re Tracy)*, 2007 WL 420252 (Bankr. D. Idaho Feb. 2, 2007) (declining to find debts incurred between former spouses outside their divorce proceeding nondischargeable under § 523(a)(15)).

15

was merely an action to *enforce* that pre-existing debt and obtain judgment. She has not established that Mr. Nabong's debt was incurred in a divorce or separation.

Ms. Zavacky relies heavily upon the Ninth Circuit Bankruptcy Appellate Panel's (BAP) interpretation of § 523(a)(15) in *Gunness* to support her claim. In *Gunness*, the debtor was found jointly liable together with her husband to the husband's ex-wife for fees arising from a fraudulent transfer action. The ex-wife filed the action in the divorce proceeding because it challenged transfer of community property her ex-husband transferred to the debtor. The BAP recognized that a number of cases have de-emphasized the requirement that the debt be owed to a spouse, former spouse, or child of the debtor.[73] Discussing these decisions, the BAP recognized a line of cases that discounted the actual person to whom the debt was payable and focused "on the economic impact discharge of the debt would have on the spouse, former spouse or child of the debtor, and whether the state court presiding over the domestic relations proceedings had provided for that impact to fall on the debtor."[74] The court observed that this line of cases considered instances where "the discharge of the debt would have adversely impacted the finances of one of those explicitly-covered family members."[75] However, because the creditor in *Gunness* was a covered family member of the non-debtor ex-husband but not the bankruptcy debtor, § 523(a)(15) did not apply even though the debt was awarded within a divorce proceeding.

*Gunness* recognizes a judicial willingness to look beyond strict construction that the debt be payable directly to one of the family members covered by § 523(a)(15).[76] Yet, neither *Gunness*, nor the cases it cites, obviates the requirement that the debt to be excepted from discharge per § 523(a)(15) be incurred in a divorce or separation. To hold otherwise would render every debt that *benefits* a family member nondischargeable under Ms. Zavacky's

---

[73] *Gunness*, 505 B.R. at 5-6.
[74] *Id.* at 6.
[75] *Id.* at 6.
[76] *See generally Adam*, 2015 WL 1530086 at *6; *Cozart v. Wilson,* 608 B.R. 514 (Bankr. D. Ariz 2019).

16

argument, as a discharge of any debt would create an adverse impact. Indeed, in support of her claim, Ms. Zavacky testified that she struggles to meet the basic needs of their child, such as purchasing school supplies, presumably for this very purpose.[77] In this instance, Ms. Zavacky's current financial condition does not change the fact that Mr. Nabong's debt to her is contractual and arose from a business relationship.

Accordingly, the debt at issue does not fall under § 523(a)(15) since it is not a "divorce-related" debt and did not arise in a divorce or separation.

## CONCLUSION

"Broken promises to repay are the stuff of all bankruptcies."[78] A broken promise to pay is not, without more, a nondischargeable debt. Based on the facts presented the court cannot find that Mr. Nabong made a false representation or acted with fraudulent intent for purposes of Ms. Zavacky's claim under § 523(a)(2)(A). Nor can Ms. Zavacky show under § 523(a)(15) that the debt Mr. Nabong owes to her is in connection with a divorce decree or separation agreement. For the reasons stated above, the court will enter a separate judgment in favor of Mr. Nabong. DATED this 30th day of December, 2019.

/s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Court

Serve:  J. Pharr, Esq.
M. Joyner, Esq.
U.S. Trustee
ECF Participants via NEF
Case Manager

---

[77] ECF No. 34-1, p. 7; Adv. Tr. 21:11-12.
[78] *Killingsworth v. Denman (In re Killingsworth)*, 2014 WL 6389931, at *11 (Bankr. N.D. Tex. Nov. 14, 2014) [emphasis in original].